Freeman, J.,
delivered the opinion of the court:
The purpose of the original, the amended and supplemental bills in tbis case is to enforce tbe collection of balance due on certain notes given by defendant, and ber then husband, Joshua Whitmore, of date 7th of January, 1860.
Three of these notes are for the sum, respectively, of $10,333, due January 1st, 1861, .1862, and 1863, with interest at the rate of ten per cent, from the time due until paid. kThe other is for $10,346, due one day after date, •.and was expected to he paid in a short time when given' — ■ in fact, was considered as part of the cash payment of $20,-000, and upwards, which was to be paid on receiving possession of tbe property purchased, and fox which all the notes were given. This property consisted of a large and valuable farm in Arkansas, with stores, stock, farming fixtures', *242 and utensils purchased by Whitmore and wife, but which was evidently considered as purchase for the wife, the present defendant, and probably conveyed to her. To-secure the balance after the cash payment of $10,000 in money, and the $10,346 note, to' wit, the three notes above described, a deed of trust was executed by Whitmore and wife to John W. Williams, with power to- sell the property and appropriate the proceeds to' pay these notes, if not paid. This deed of trust conveyed all the property purchased.
The ground on which the complainant goes, taking the original and supplemental bills together, is simply that the defendant had a separate estate, and had charged the same with the payment of these notes. To enforce this supposed liability of said separate estate is the first object of this.litigation. On the one hand, it is insisted that Mrs. Whitmore had the power to charge her separate estate, and has,-,done so; on the other, it is maintained she neither had the power, nor has agreed to. do so.
On the question of the powers of a feme covert holding a separate property, there has been, as is well known, a diversity of judicial opinion both in England and America. The rule established at present in the English courts of chancery is, that in respect to her separate estate, she is to bo regarded as a feme sole with all the powers that belong to that character, and that her note or bond, as such, will bind her separate property. See Leading Cases in Eq., vol. 1st, top p., 504, 519, 528; note to Hulme v. Tenant.
In enforcing remedies against such estate, however, no personal decree, even in England, is made against the married woman, but only against her estate. Erancis v. Wig-gen, 1 Wadd., 264; L. C. Eq., vol. 1st, 517.
It is not anywise certain that under the English cases, the corpus of separate property could be appropriated to the payment of her general engagements, certainly not /as to real estate, as far as we have examined the cases. The *243 rule laid down by Lord Thurlow, in tbe leading cases of tbe Hulme v. Tenant, 1st Br. C. C., 16, is “that the general engagement of the wife shall operate upon her personal property, shall apply to the rents and profits of her real estate, and that her trustees shall be obliged to apply personal estate and rents and profits when they arise, to the satisfaction of such general engagement,” but he adds: “This court has not used any direct process against the separate estate of the wife, and the manner of coming at the separate property of the wife has been, by decree, to bind the trustees, as to personal estate in their hands” (that is, as we understand it, money), “or rents and profits, according to the exigency of justice, or of the engagement of the wife to be earned into execution.” It is also said that no case was then known, where the court had gone to the extent of directing the trustees of the estate to make conveyance of the real estate, or by sale, mortgage or otherwise, raise the money to satisfy that general engagement on the part of the wife. See 1 L. C. in Eq., 517. This was laid down before it had been held that the wife could hold separate estate at all, except by the intervention of the trustee. In the United States, however, a different doctrine has obtained on the general question, and is now settled in a large-number of the states. It is thus laid down by Chancellor Kent, in the case of The Methodist Church v. Jaques, 3 Johns. Ch. R., 78, decided 1817. He says, instead of holding that the wife is a feme sole, to- all intents and purposes as to her separate- property, she ought only to- be deemed a feme sole sub modo, or to the extent of the power clearly given by the settlement. Instead of maintaining that she has an absolute power of disposition, unless specially restrained by the instrument, the converse of the proposition would be more correct, that she has no power but what is specially given, and to be exercised in the mode prescribed, if any such there be. Her incapacity is general, the exception is to be taken strictly, and to be shown in every case, *244 because it is against tbe general policy and immemorial doctrine of tbe law. It is true, this case was reversed on appeal in New York, but the weight of the character of the learned chancellor has given effect to the opinion held by him, so that notwithstanding this reversal, the principle maintained by him has been substantially followed as the sound exposition of the law by many of the ablest courts of the union. In Tennessee, the reasoning and rule thus announced by Chancellor Nent, has substantially been adopted and followed with almost singular uniformity by numerous decisions. There may be some apparent diversity in the application of the rule in some of our cases, but the rule itself has at all times been recognized, as originally laid down by Judge Green, in the leading case of Morgan v. Elam, 4 Yer., 445, 446, and 451. Judge Green said in that opinion: “As by the common law rule, the legal existence of the wife is suspended during the coverture, and she is rendered incapable of making any contract, it would seem to follow that when separate rights and distinct powers are conferred on her by a deed of marriage settlement, that such deed should be so construed as to give her none of the powers of a feme sole, other than those expressly conferred by it. Upon the whole,” he says, “I conclude that the farthest the court can go upon principle, is to ascertain, by a fair construction of the deed, what was the intention of the grantor, and to cause that intention to be carried into effect.” [Pages 446, 441.] Judge Catron says, after referring to the common law disabilities of the wife: “But equity permits her to be exempt from this rule, so far as she stipulates for exemption; yet the court can give her no powers beyond those given by the settlement. She acts substantially as an attorney in fact in such case, as she well may in any other. In either [case], she must pursue the express authority; all beyond is void.” [Same, case, p. 451.]
We think the sound principle is given by Judge Green, *245 in the above case, that when we look for the powers of a married woman by reason of her having a separate estate, and in so far having a separate existence from her husband, in contravention of the rule of the common law, we must look to the instrument by which this separate estate is created, and out of which these independent powers spring, to ascertain their extent. If it be a deed by which the property is conveyed to her by a third party, rhe fairly expressed intention of the instrument, taken in connection with the objects and purposes of the conveyance', will furnish the measure of her powers over it. - When this intention and purpose is thus ascertained, it should be carried out by the courts, and the feme held to be entitled to exercise all such powers in reference to said estate as are thus conferred. If it be a marriage contract, then such powers as are reserved to the married woman in the contract, construing it fairly, so as to effectuate its purposes and objects, may be enjoyed [exercised] by her. This' comportsj we think, with the sound legal logic of the question. Whatever powers she can possess are the result of the instrument creating the estate-or the contract under which she holds it freed from the mutual disability and right of her husband. To the extent these instruments have freed her from disability, she is free to act. Beyond the power thus granted ■or reserved, the general rale of law must prevail that her separate existence is merged into that of her husband during the coverture. As a matter of course, we do not mean to be understood that there must be an express grant in so many words for every act she may do-, nor does Judge Oreen so lay it- down in the principal case, the same general principles applicable to all other contracts and instruments applying in this case, that it is to be construed in reference to its object and purposes, so as to carry out those purposes and make them effectual, not to defeat them. To illustrate the idea, if an estate in land (a farm for instance), be conveyed to a married woman to her *246 sole and separate use, tbe evident object is, that sbe shall from its nse, cultivation and improvement, derive an income from it for her support and maintenance. The means to this end are necessarily implied in the object of the grant; she may, therefore, fairly be held to be empowered to make such contracts in reference to the cultivation and improvement of such estate as will make it subservient to the end for which it was given. In being an equitable estate, one originally only allowed to exist by the intervention of a trustee, whatever contracts or engagements in reference to this estate, which a trustee would be directed to malm, if a court of chancery were applied to in such a case, may fairly be done by the owner in equity, without such direction, as within the powers arising by necessary implication out of the possession of such an estate, and the purpose for which it was created or given.
But without going into the general question farther, we may assume that a married woman acts, under the law in Tennessee, by virtue of the powers granted or retained in the instrument by which her separate estate is created.
We need not review all the cases in our reports by way of showing from their peculiar facts how they sustain the principles above announced. The case of Porter v. Baldwin, 7 Hum., 175, will illustrate the propositions announced in the latter part of the above statement of. the rules governing the question. The bill in that case was filed by Porter v. Baldwin and wife, to subject the separate estate of Mrs. Baldwin to the payment of the debt for rent of a house. The bill alleged that Baldwin, the' husband, was insolvent, and that Porter had rented to Mrs. Baldwin a house in Nashville, she having a separate estate, mostly in slaves, for four hundred dollars, with an agreement at the time that he should look to her for payment from her separate estate; that she had paid two hundred and fifty dollar’s of the sum, and had promised in writing, signed by her, to pay the balance of one hundred and fifty dollars, but had *247 failed to do so. The bill prayed this sum be decreed to complainant to be satisfied out of said separate estate. The bill was taken for confessed. The court adopted the principle we have given from Morgan v. Elam, that we must ascertain by a fair construction of the instrument, what was the intention of the grantor, and cause that intention to be carried into effect. Upon this principle, says Judge Green, the power of alienation is not to* be restricted on the one hand alone to cases where it is expressly conferred, nor on the other hand does it exist in any case where it is not expressly prohibited, but the powers of the wife over the property, and .the use. she may make of it, must depend upon a fair interpretation of the meaning and intention of the settlement.
The court then assuming (the deed of settlement not being before it) that the wife had a separate estate vested in her for her use, with no condition or restriction of her power over the same, that'it was settled on her for her maintenance. In this view of the question, the court held the wife might charge such estate for necessaries by express agreement, such as was charged (a home or house in which to live) certainly being such a necessary.
The court say it was given for the support of the married woman, and there might be no profits, or not enough for her support. If the estate cannot be applied, the very end for which it was given will be defeated. The court then gives the principle thus: “We think, therefore, that where there is no restriction on the settlement, and the profits are insufficient for her support, the wife may, under the direction of a court of chancery, dispose of part of the principal of the estate for her necessary support.” The decree was that the clerk should ascertain if there were any profits* of the estate to meet the debt; if not, what property could be applied to the payment of this debt with the least detriment. The first case and the last bring out the true principle in such cases, and embody the law as long settled in our state. *248 If, however, a specific mode of disposition or sale is pointed ont in the instrument, then the power must be exercised in substantial accord with this mode, subject, however, to the general principle of the case of Porter v. Baldwin, that to-attain the ends of the settlement, the support and maintenance of the wife, or the proper use and enjoyment of the estate, or for its protection and security, the wife would have, of necessity, the implied power to charge by express contract to that effect, such charge to be enforced under the direction of a court of chancery.
The cases in Tennessee on the question are [Marshall v. Stephens], 8 Hum., 159; [Litton v. Baldwin], Ibid., 209; [Cherry v. Clements], 10 Hum., 552; [Ware v. Sharp], 1 Swan, 489; [Woodrum v. Kirkpatrick], 2 Swan, 224; [Simmons v. Kincaid, 5 Sneed, 453; [Hoyle v. Smith], 1 Head, 90; [Hughes v. Peters], 1 Cold., 67, with others not necessary to be cited. There may be, as we have said, in seme of our cases, an apparent want of conformity to' the above rules in a first view, but when carefully scanned, it will be seen they all go on the principles announced substantially, unless Young v. Young, 7 Cold., 461, be an exception, which we need not discuss at present.
We then turn to the instrument creating the separate estate of Mrs. Whitmore, to ascertain what are her powers OA^er the same, and how far she is released from the disabilities of the coverture.
After reciting the fact that a marriage was contemplated, and the possession of property by the parties to the contract, it is agreed, that “the parties, respectively, shall not, and Avill not intermeddle Avith, or have any right, title or interest either in laiv or equity in or to any of the property, real or personal, of the other party, nor to any part of the rents, issues, profits', hires, etc., arising therefrom, but the same shall remain and be to the said party, to whom the same now rightfully belongs, or to such uses as the party now seized or entitled thereto shall think fit and appoint- In *249 order to carry out this object, it is further contracted by Whitmore, the husband, that all his wife’s property shall be reckoned a separate and distinct estate of and from his own estate, and be in nowise subject to him, or to the payment of his debts. It is further provided, substantially, that it shall be subject to be ordered, disposed, and employed to such uses and purposes, and in such manner, as that the ready money arising from said separate estate shall be vested as the said Martha D. may direct, and the securities be taken in her name, and, in a word, that the estate should be entirely under the control of the intended wife, for such uses and purposes as she in her lifetime might desire and direct, giving her power to limit, order and dispose of the same, either by last will and testament, in writing, or by any other writing whatever, signed by her hand in the presence of two “creditable witnesses,” adding, she being hereby and herein constituted and made so far as by the use of legal formula she can, a feme sole as to the management, control and disposition of said estate. It is evident from this summary of the marriage contract that the husband’s right is entirely excluded, and as to rents, profits, hires, issues, etc., arising from said estate, the absolute use and control of the same is reserved to the wife, as fully as she had before the marirage. And the ready money arising from the same she could invest as she chose, taking the securities to herself; that as to the corpus of the fund, she retained the absolute control of it, could order and direct its use, but when it is to be disposed of, either by “will or deed, or any other writing whatsoever, she has prescribed to herself the mode in which it is to be done, that is, by writing expressing her purpose,” signed by her own hand in the presence of two creditable witnesses, to use the language of the instrument.
This being tjie terms of the instrument, and its fair construction, we hold that while she could charge the rents, profits, and hires, by virtue of her absolute control over *250 them, by a simple agreement or contract so to do, yet she could only dispose of the corpus of the estate in the manner prescribed. The power to dispose of would necessarily carry with it the power to incumber or charge, as. the greater includes the less, and on the same principle that a power to sell would give the power to mortgage or charge the same. 4 Kent Com., p. 148. Yet as this is included in, and is in virtue of the power to sell and dispose of, and would be but an execution of that power, it would have to be exercised in performance [pursuance] of the requirements of the instrument authorizing it, and be subject to its limitations. In a word, it would have to be done in execution of the power, either by last will and testament in writing, or by any other writing whatever expressive of her purpose, signed by her hand in the presence of two. creditable witnesses.
Applying these principles, it is clear that the notes sought to be enforced, simply of themselves, would not be a charge on the corpus of the separate estate, and that they contain no such contract on their face, in execution of the power, as would certainly evince a purpose to create a charge on said property.
However, we hold, that from the proof in. the case, there was no purpose or contract or intention that the three last notes should be a charge on the separate estate of Mrs. Whitmore. The fact that a. deed of trust was taken on the entire estate to secure the payment of this balance of $31,000, $20,000 being provided for otherwise as the cash payment, would go far to rebut the idea that any other security was looked to for the payment of these notes. The answer expressly denies that their payment was agreed to be a charge on her separate estate, and the proof tends more strongly to sustain the answer than to overturn it. On well settled principles, it must be taken that the complainant fails, to make out his case, in favor of the proposition *251 that these notes were a charge on the separate estate of Mrs. Whitmore. As to these notes, complainant is entitled to no relief against the estate sought to be subjected.
But the question recurs as to the first note of $10,346, part of the cash payment. It is admitted in the answer that for this note her separate estate was to be bound. After denying with emphasis that her separate property was to be bound for the last three notes, respondent says she denies Williams sold said property, created said debt, or extended said credit on the faith, or with the expectation that she or her separate estate would be bound or liable for the payment of the same, or any portion thereof except the $10,-000 paid in cash, and the $10,346, which, at the same time, she had arranged to pay, was considered as cash and has since been paid. The same admission is repeated in the answer. Now, on the principles we have laid down, to the extent of her power under the marriage settlement, and so far as she has complied with the mode pointed out by which she could do so, she has charged her separate estate with this debt. That is, she has contracted that said estate shall be so charged. This is all that is required to fix the liability of such estate, where the power to charge exists, such contiact to be proven as in other cases of contract, by appropriate evidence. It is not the creation of an incumbrance on the estate, or lien on it, which, under our law, could only be created by an instrument regularly executed for the purpose, so far as real property is concerned, when sought to be shown by express contract. Gilliam v. Esselman et al., 5 Sneed, 88. It is the exercise of the power given in- the instrument in reference to the particular estate, which may be proven, as we have said, like any other contract, and when so proven, is enforced by a court of chancery against the estate, by the sequestration of the profits, as the first source, or by appropriation of money derived from the estate, if in the hands of the trustee, and in a proper case, by sale of such portion of the corpus of the *252 property as may be deemed best by the court. Mrs. Whit-more had the power by the instrument to dispose-, in any mode she chose, of the rents, profits, and issues of her property, and having such power, she could make a contract by which they should be charged with, and appropriate it to payment of a debt contracted, as well as dispose of them in any other way. But as to the corpus of the property, she has expressly provided the mode in which this is to be done. Wc need not inquire into the motives or reasons for this provision. Sufficient to say,.that no law forbids her so limited powers, or the exercise of them in the way pointed out. She could only dispose of this by a will or other writing expressing her purpose so- to dispose of it, signed by her own hand, and witnessed by the two witnesses provided for. This note we ho-ld was a charge by the contract on so much of her estate as she could bind by virtue of her absolute control over it, with no limitation or restriction upon its mode of disposition, that is, the rents, profits, hires, and issues of the estate. It is insisted, however, the note- has been paid; if so, the question as to whether the note is a charge on the corpus of the property is not important.
■ Has the note been paid as claimed? It appears by satisfactory proof, that Ferguson, who died in 1865, a son-in-law of defendant, acted as agent of Mrs. Whitmore in the collection of her money, and remitting the same to Williams in discharge of the notes given by her. The facts, as far as we are furnished them, are that up to- April, 1860, upwards of $5,000 had been remitted to Williams, which was credited on this nqjte for the cash payment. The next remittance was January 8th, 1861, after the first note- fell due. This was credited by Williams on this last note. There were other remittances during the year 1861, which, with the amount paid in 1860, and credited on the note in controversy, make about the sum of $18,000, enough it will be seen, to have paid the balance on this note, and left a credit of over $6,000 on the note due January 1st, 1861. *253 After careful examination of the letters from Ferguson, and the facts in the case, we conclude there is nothing in this case to take it out of the general rule that a creditor has the rigt to apply payments made, unless directions as to their application is given by the debtor. This rule is subject to exception, it is true, to prevent injustice (see Bussey v. Gant, 10 Hum., 242); but we do not find any special grounds in this case to bring it within the exceptions; on the contrary, there is persuasive evidence that the money has been properly applied. It is clear that Williams had been led to expect the note due January ist would be paid by remittances to be made in the early part of that year. In fact, it was expected that the note due January 1st, 1,861, and also 1862, would be so paid. December 25th, 1860, Ferguson writes that his expectations as to money had been disappointed, and it would be-impossible to take up more than the note due January 1, 1861, and that during the month in different payments. He adds, he has now on hand $5,000, and was authorized by Mrs. Whitmore to get the other $5,000, even at a sacrifice, and suggests that this note be sent to Memphis, so that different payments made on it might be credited at the time paid. It is true, he says, in conclusion, that he believed there was a balance of about $5,000 due on the first note, and it would be impossible to take both notes up, yet no direction is given to apply payments to the extinguishment of the last mentioned ©ote. The fact that a sum sufficient to have paid this note was remitted, credited on the note of January 1st, 1861, and the other note not claimed to- have been paid, but permitted to remain in the hands of Williams, satisfies us that there was no objection to the mode in which the payments had been applied; on the contrary, we think it is evidence, in connection with the other facts, to show that the application had been in accordance with the understanding of the parties. After so long a time, without complaint, it is too late to ask that there shall be a change in the *254 application of the credits. We hold, therefore, that the balance on this note remains due and'unpaid.
The question then remains as to' whether the note is executed in pursuance of the power, so as to bind the corpus of the property. On this question there is much nice learning in our books. The rule is thus laid down by Chancellor Kent, vol. 4th, 330, 334. While it is best that a reference should be made to the power, when an act is done in pursuance of it, “yet the power may be executed without reciting it, or even' referring to it, provided the act shows that the donee had in view the subject of the power.” A will may be good in execution of a power, in a case wheie there is no reference to it, if it be a case in which the will would be inoperative without the aid of the powei; and the intention to execute the power is clear and manifest. The intention is the great leading object of inquiry. 4 Kent, 336 [Gee v. Groves]; 2 Head, 242 and 243, and authorities there cited. Taking the admission that this note was intended to be a charge on the separate estate or its proceeds, and this the contract of the parties, that it is witnessed by two witnesses, signed by her own hand, the intention is clear to execute the power, and thus bind the corpus of the separate estate by the act. It is a strict pursuance of the power, can only carry out the intention of the parties by being in pursuance of the power, and must be held to have been executed for this purpose. A simple note, even signed by the party and witnessed, would not of itself be sufficient, but where the intention to execute the power is made clear, it may do so.
The result is, as to all the conveyances of real estate in Shelby county, they being purely voluntary to her children, this note or the balance due on it, must be held a charge, first, on the rents and profits, and if not sufficient in a reasonable time to discharge this debt, when sequestered for this purpose by the chancery court, then so much of the corpus of the property may be directed to be sold as *255 will satisfy the balance, selling that which will be least detrimental to the estate, treating the land as still property of Mrs. Whitmore, so far as this debt is concerned, the conveyances as void as to this debt. If, on inquiry, the court below finds that the rents of the lands will not pay the debts in a reasonable time, then the sale may be ordered without reference to the rents being applied for the purpose.
The next question is, whether the defendant, Botts, is liable for $13,000, difference between the amount he bid for the Arkansas land, sold by the trustee under the deed of trust,-and what it sold for at a subsequent sale made by the same trustee some months after. The facts necessary to be stated are, that the trustee advertised the land for sale under the deed of trust, and offered it for sale in 1865, when it was knocked off to Botts, as the highest and best bidder, at $28,000. Botts being disappointed in raising the money, probably by failure of another party, refused to take the land, or accept the deed tendered by the trustee. Thereupon, some months after, the trustee advertised the land again, in accordance with the requirements of deed of trust, and sold it to one Edginton, for $15,000. It is sought now to charge Botts with this difference. It is proper to say, as to the question of the statute of frauds,. argued by counsel, that the bill alleges a sale, a memorandum of the bid, with name of .the purchaser, made by the auctioneer at the time. This is not denied by the answer, but is by fair construction of the answer impliedly admitted, for on this subject he substantially says that he admits the sale charged, and that he was the highest and best bidder, and the land was struck off to him at $28,000. He also admits the second sale, as charged, but denies his liability for the difference in price between the two sales. He then goes on to give his reasons for non-compliance with the contract, and puts in his defenses against the liability charged. There was failure, as he says, on part of the *256 trustee to tender him a good and sufficient deed; that he could not make a good title on account of "Foky claim,” and then insists that the last sale was improperly made, etc. In this state of the pleadings we assume that the sale must be treated as valid, that is, that there was a sufficient memorandum under the statute of frauds or else the defendant would have properly interposed this defense in his answer, and not having done so, under the circumstances, in connection with the admissions of the answer, we think concludes him from now insisting- on this defense at the hearing.
Assuming this to be the state of the case, we come to the question so earnestly insisted on, of the liability of Botts for this difference. W e have had no case of sale by private parties at auction of rea.1 estate in this state, where the question has been presented, nor have we been pointed by counsel to any case in point. We have found one case, Tullman et al. vs. Franklin, 14 New York, 584, where, on failure of the purchaser to complete his purchase, the property was resold, and he charged with the difference, but in that, such a condition was in the terms of the sale, and, therefore, a pai*t of the contract.
We conclude, after careful reflection on the question, that the rule sought to be maintained by complainants, is not the proper one, and that the difference between the price at the two sales is not the correct measure of the defendant’s liability, assuming as we do, that a valid contract existed. Botts is certainly liable for damages for failure to coipply with his contract. But complainant, or the trustee, still held the legal title to the land, and sold, not as Botts’ land, and under the deed of trust, thus treating it as their own, and accepting a disaffirmance or refusal of Botts as a breach of his contract, and now assume a broken contract as a basis of his liability to damages. On sound principle, we think Botts is liable for damages, but the measure *257 of those damages must be the difference between the sum bid by Botts, viz.: $28,000, and the market value of the land at the time of Botts’ purchase. In other words, if this was a good sale, the vendor would be entitled to its benefit. If the land, for instance, was worth really only $25,000, or $27,500, as bid by Edrington on that day, then the difference between this value, and what Botts had bid, is the true measure of damages. The complainant, as we have said, or vendor, got the land, and the difference we have indicated would give him, then, the full measure of his contract with Botts, and this he is entitled to. To hold that the price at another sale,- made months afterwards, would be the measure of damages, would be to adopt an arbitrary rule for ascertainment of damages on breach of contract, that might work the gravest injustice in cases of private sales like this. It would leave it in the power of the vendor to make a sale at any time, for there could be no fixed time in which the resale should be made; it might be under the most unfavorable circumstances, and thus, by his own act, fix the measure of his damages for breach of contract. It would, furthermore, present great temptation in many cases, wrhere the first purchaser was good, to reckless sales, .regardless of procuring the best price, on which the interest of the party failing to comply with his original contract would have no protection whatever, and would be most likely sacrificed. We do not think the principle contended for is sound, nor that it furnishes the proper measure of damages in such cases. The rule we have given we do think meets the justice of the case, and runs well with the general analogies of the law on the subject of damages for breach of contracts of sale. The cases cited by counsel in 4th and 5th Sneed [Williams v. Godwin, 4 Sneed, 557; McClure v. Williams, 5 Sneed, 717], of sales of personal property, where it has not been delivered and purchaser fails to pay, where the seller after notice to purchaser, may *258 sell tbe property and appropriate proceeds to pay Ms debt, and recover balance agreed to be paid by seller, rest on an entirely different principle from the case before us, and do not furnish a proper rule to guide us, nor do we think the other cases of judicial sales have any application.
"We believe this substantially disposes of all the questions presented in the case.
A decree will be entered in accordance with this opinion. Mrs. Whitmore will pay two-thirds of the costs of the court below, and Botts one-third; complainant will pay one-half the costs of this court, and Mrs. Whitmore the balance.
The case will be remanded for proper proceedings in furtherance [pursuance] of this decree.